14-5800, USA v. Rocky Houston. Arguments not to exceed 15 minutes per side. Mr. Jagger for the appellant. Morning. May it please the court and counsel, my name is Steve Jagger and I do represent Rocky Houston. This appeal is from the Eastern District of Tennessee. It involves three issues pertinent to the court's discussion this morning. The first category of issues deals with two searches that occurred. The first one being from October 9, 2012 to December 19, 2012. That search being a 65 day warrantless search by a pole remotely controlled video camera. The second period of search is December 19, 2012 to January 11, 2013. On the day this court issued the decision, Anderson Bagshaw, the agents that were investigating this case went to the district court magistrate and had a warrant issued based on what they had observed in the covert remote surveillance over the 65 day period. Together with some other statements that they had gathered during the period of their investigation. The second category of issues deals with opinion testimony that was offered by the federal agents during the course of the trial relating to the jury what was contained in the covert surveillance. I believe that was done without a sufficient foundation. The third issue deals with a sentencing question about the number of firearms that were used to enhance the sentence. The district court utilizing six enhanced points as opposed to what was proper, the four points, which were less than the sentencing range. A close reading of the record reveals that the government is attempting to have its cake and eat it too in this case. On the one hand, the government asserts that the use of the pole camera was required because conventional law enforcement techniques and observations were either unavailable or had been tried and failed. On the other hand, the government takes the position that the matters recorded were unobstructed observations of open fields and unobstructed curtilage. They can't have it both ways. The cases relied upon by the government can be fairly distinguished from this case because the open field doctrine provides no cover for what the agents did. Likewise, the good faith exceptions that were relied upon by the district court do not apply under the facts of this case. Let's first... I'm not sure why they both can't apply at the same time. If, for instance, you're doing something out in the open but you don't do it when there are police around, you then stop doing it. Does that mean that they can't come incognito, for instance? And maybe that's expensive to buy the costumes and so it's easier to be there all the time? I mean, just because something's more expensive doesn't mean that you have a reasonable expectation of privacy in doing it without being seen at all. I don't think expense has anything to do with it. I don't think expense has anything to do with it. I think what happens in this case is... Practicality has something to do with it, though, is what I'm suggesting, not so much expense. I think that when we have a 65-day recording of all activities... I understand that argument. I anticipate you're making that argument. But you seem to be saying that if it's practically difficult to do, there must be an expectation of privacy. That can't be. No, I don't think that's what I'm saying. If that's not what you're saying, then just proceed. I think what I'm saying is that if it's impractical for them to do it... There must be an expectation of privacy in that situation? No, I think they need to go get a warrant.  If there's no expectation of privacy, they don't need to get the warrant. So you're basically saying if it's difficult to do, even though it's out... If it's difficult for the police to catch it out in the open, then it's not out in the open. That seems like a strange rule. I just don't think they can have it both ways. I don't think they can rely on the warrant after 65 days of this surveillance, because the Open Fields Doctrine is not unfettered. I think that's where we're at. The Open Fields Doctrine is not without limitation. A search can be unreasonable because of the intrusiveness of the search. I think that's what we have in this case. And you're saying the Open Field Doctrine doesn't apply because there's supposedly some things blocking the backyard? I think that unlike the case of the Anderson Bagshaw case, I think that the Houstons had taken steps to manifest the expectation of privacy that they had in the farm. This camera was mounted on a pole overlooking the neighbor's roof. The Houstons had taken steps to control access to the farm by blocking the roadway. They had trucks and things parked in the driveway. The blue tarps had been hung around Leon Houston's and Rocky's brother's trailer to keep people from viewing what was going on there. At different points of time during this video surveillance, the foliage and trees obstructed the views, and there was a distance between the roadways and the Houston's residents, Rocky Houston's residents, there were three residences on the property, Rocky Houston's residents, and the agents testified that they had difficulty seeing up there. The best they could do was see the carport. So they mounted this camera without a warrant to record continuous daytime surveillance of the property. Could a person have been where the pole camera was? I doubt anybody would have sat up there for 65 days. That wasn't my question. So any time something was blocked, the pole camera couldn't see it then, right? No, it was higher. It was remote and overlooking. So he could have climbed up the pole and sat there? I guess they could have, but I think if they were going to do that, what they got, they could have went and got a warrant just as easy, because they knew what they were looking for. Okay. There's no vacant lot next to the property. Bagshaw, both the Supreme Court and this Court has expressed concern about this type of surveillance and the length thereof. Are you talking about Jones? I'm talking about Jones and I'm talking about Anderson Bagshaw from this Court. So the Houstons had exhibited a subject expectation of privacy. There was also the question, I guess, the second prong of that test is whether there's an objective expectation of privacy and whether this long-term surveillance would be deemed reasonable under both Jones and under Bagshaw. I just want to ask you this question, and I'm not sure that it's necessarily germane, I guess, to your argument, but in these expectations of privacy are tied to, I guess, evolving notions of privacy and all of that, and as society has moved where seemingly everything is public and there's the ability through cameras and drones and some of everything else to capture pretty much every aspect of our lives, do you have an issue there with this open area having a realistic or reasonable expectation of privacy under these evolving expansive norms of surveillance? Judge, I agree this is an evolving area, and I know the law is sometimes a little bit slow to catch up, but I think that the law is beginning to recognize, and this circuit has recognized in Anderson, that there has to be a limit. Judge Reeves in this case was not willing to... The magistrate had thought that the warrantless stuff should have been suppressed. Judge Reeves disagreed with that and seems to say, in his opinion, he didn't want to establish a bright-line rule. I think he references 14 days in his opinion. The analogy that I think that we need to make when we look at what the objective expectation of privacy is, the use of this camera for such a long duration, conducted without a warrant, it was covert, is tantamount to allowing a police officer to be posted outside your home in a public area and watch every coming and going that you make, how you're addressed. Can't do that? I don't think the society would recognize that as reasonable now, not for a period of 65 days. If you're doing something that's illegal or legal, but you don't want the police to see it, but you want to do it out where other people can see it, so you could post one of these... I'm asking a hypothetical now. You could post a device which would report to you whenever a police car or any car is coming down the street towards your remote location, and you could then go back in the house whenever someone's coming around. That relates kind of to Judge Donald's question. I mean, I think one could argue that the police ought to be able to do the same kinds of things that the people who are doing criminal activity are able to do. In this day and age, you could, arguably, if we accept your theory in the context of this case, somebody could just make sure that the police don't see them because you're monitoring their activity. I think the distinction would be, and Ben, if I understand the question, is that you're talking about the police driving by and seeing and those kinds of things. Yeah, I mean, you could say, well, the police could drive by. That's okay. They just can't stand and watch. That's kind of hard on the police because they're going to see you coming and stop doing it. I think that it's sort of like the flyover cases which are allowed to be in open fields, the Cirilla, I don't know how you say that case name, but the brief flyovers, that's not what we have here. It's the continued nature. The real legal question in my mind is the reasonable nature of the police activity. It's the continued nature for 65 days. Would our society recognize that to be a reasonable expectation of privacy, that the police could sit outside your house or remotely video, monitor, and record? If you were living in a neighborhood where there was somebody across the street, for instance, somebody else could look out the window day and night, you wouldn't have anything to complain about, would you, as long as they were just looking at the outside of your house? Well, I think the Fourth Amendment addresses governmental action. I think the government... That would be a problem? I think it would be a problem. Okay. Because what we have here is... What's the time limit then? They can look at your house for three weeks but not four? I don't know. Can they look for five days and not ten? I don't know what it is, but I know that or I believe that the reasonableness... If the court would say this is a reasonable expectation, I think it's an unwarranted expansion of the reasonableness requirement. Is there no limit to the open fields doctrine then? There has to be some limit to that. It can't be unfettered. Or we're all going to be under... What's your best case for this is on the other side of the limit? Is it just Jones? I think Jones. I think Garrison Bankshaw says, you know, 14 days. I think Jones is probably the best one that's been... You're sort of kind of asking us to set a limit. I don't know that you need to set a bright line limit. I think what you need to do is say... You want us to set a new limit. I think you just need to say that it's unreasonable for 65 days. Do you need to send a limit? Maybe that's a case-by-case determination based on the facts of every case. Maybe it's determined by the facts of what the police have already in their possession at the time they're doing this. They had tried to do the roadway surveillance. They were unable to do that. They couldn't see what they wanted to see. So what do they do? You know, they're trained law enforcement officers. We understand that. I think your time has expired and you'll have to recover. I'm sorry. No problem. Thank you. Thank you. Good morning. David Jennings for the United States. There is no case factually like this one. To be here on such a simple one-count felony possession indictment, factually this case is like no other. As you analyze this Fourth Amendment issue, you have to know the setting of the Houston family farm. You have to know the background of the Houstons with law enforcement. You have to recognize, as Judge Reeves did over and over during his sentencing, that this place was a fortress. Whether it's a fortress, does that affect whether you can use a pole camera? Well, it affects whether a law enforcement officer can safely conduct drive-bys or physical surveillance of the Houstons walking around on the farm openly and notoriously carrying weapons. Does the fortress have an effect upon the expectation of privacy? No, I don't think it does. I think it explains why the agents in this case chose the investigative surveillance tactic they did, one which would allow them to do it safely. The question is whether they should have got a warrant or not. Well, I'll get right to that. Of course, in October of 2012, no circuit had held that a warrant was required for the installation of a pole camera. The question is whether we should hold that or not. Well, that's what the defense is asking, of course. Right, I know. What's the answer to that? The answer is we have guidance from Judge Reeves for the future. At the time when the decisions were made, there was no requirement. You're making a good-faith argument? Of course. Of course. Of course, but I thought your primary argument was there was no violation. Now you're saying, well, there may well have been a violation, but it was in good faith. I'm wanting to know whether there was a violation or not. And then you can go to the good-faith argument. I say first that there was not under existing law. What about under the law? Lawfully. Anderson Bagshaw decided on December 19th, in the middle of the surveillance period, there was an opinion by Judge Moore. There wasn't a holding. She opined that there may have been a violation. I think what we're asking is whether there was a violation under the Fourth Amendment. And you say under existing law, the Fourth Amendment certainly existed. And we're trying to, at a baseline, get whether or not the actions of installing the camera without a warrant constituted a violation of the Fourth Amendment. And then if you say that the action comes within some kind of exception, fine, tell us that. But I want to know how this action, how the installation of that camera, comported with Fourth Amendment at that time. Well, the camera was installed on a telephone pole in the right-of-way of a public roadway, overlooking open fields. And yes, it had Zoom capability and capability to move it around to different sections of the farm. But it could not capture anything where a person reasonably had an expectation of privacy. For instance, behind the blue tarps around Leon Houston's trailer. It couldn't capture what was happening on the porch. Because it was not a violation in the first place. Correct. And another thing is that... His argument is really not focused on that. It's focused on the time. It's like maybe you could do that for a few days, but you couldn't do it for that many weeks. I think so. It seems to be that argument. I don't know. I don't know what the basis for it is other than sort of statements in cases that were concerned about this kind of thing. Right. And Judge Reeves held that the length of time was a problem in this case. But he found good faith on the part of the agents and refused to suppress the evidence. Well, we want to know and I want to know, and I think my colleagues indicate someone they want to know, whether not just it's a problem suggests this is something we need to think about. How should we decide it? Not just is it something we should think about. I took Judge Reeves to be saying this was not a violation. Well, I think you're right. And I'm asking this court to... Can you address whether it's a violation without getting into good faith before you get into good faith? The length of time. Well, I will concede the length of time should be a factor the court should consider. I'm not asking whether it should be a factor. I'm asking whether the length of time in this case constituted a constitutional violation. I don't say no. I say no. Now what I'm asking is what's your support for that? There's just no basis and that's it? Yes. Okay. Now with regard to other issues that, well, I've alluded to the fact that I believe the suppression issue is squarely answered by Leon Herring Davis and that suppression was not an appropriate remedy and remains the case. Another issue he complains of that he didn't really address other than in a cursory fashion moments ago was the agent testifying, telling the jury, narrating, so to speak, when the still photographs were shown or the videos were played. And, again, this was a case where you had to be there to appreciate this. Although this camera had a zoom effect on it, this camera was mounted 300 yards from the area where the residences were located, albeit they weren't close together, but 300 yards or so to Leon Houston's trailer, which was the closest. How high was it? A typical telephone pole. I mean, I don't have a measurement for you, but a typical telephone pole. But when you zoomed, the camera got grainier, making it more difficult to figure out what you were looking at. You could actually see greater detail when it was from the pole. But as it zoomed, it got grainier, even though you were getting closer. But at its most zoomed, you still felt like you were a football field away. Are you addressing now this issue about whether the agent should have been able to explain what was going on? That's right, exactly, where he could help the jury understand what they were seeing. And that is exactly what he was doing. He was saying, I can tell you that's Rocky Houston carrying a firearm because I watched him for weeks and weeks, and I know his mannerisms as opposed to Leon Houston's. I know the color of his hair being essentially gray as opposed to Leon Houston's being very dark. I know the brown car hat jacket that Rocky Houston wore practically every day. He came out of his house and walked down to Leon's trailer to do what they did, which was target practice and do other farm activities while armed with a gun. And he was simply assisting the jury in understanding details such as that. He was not, except with a couple of exceptions, identifying a particular firearm in the possession of either of those individuals as they possessed him around the farm. He did do that, right? I mean, he did it. He showed it. There was a Ruger Mini-14 Ranch Rifle, as it was referred to. How far away was this camera? 300 yards? And it was distinct from the other firearms in its shape, but most importantly in the color of its barrel, which was chrome as opposed to blue steel or black. And on occasion, which Agent Dobbs did point out to the jury, the sun hitting that barrel, it would reflect light like it was hitting a chrome fender. And he was able to say, I believe that to be the Ruger Mini-14 because of the reflection of the sun off of the barrel. But those were the types of things, pointing out the color of a jacket, the color of hair, to be able to help the jury understand when they were looking at, for instance, this defendant, Rocky Houston, in possession of a firearm. With regard to, in case this is addressed in rebuttal, with regard to the sentencing, he did argue briefly the number of firearms enhancement. The proof in this case made it very clear that the Houston brothers had unfettered access to each other's homes. That these individuals did not work. They never left that property hardly. And on most days, they were out and about in the open fields of the farm, carrying firearms and doing whatever it is they were doing. There were... Mr. Jennings, remind me again, how large was the farm? How much acreage? Because you started out by describing this as a fortress, and then you intimately referred to it as open fields, which would suggest that a fairly large area. Do you recall the acreage of the farm? Judge, there are several parcels to the farm, and I think they may total 500 acres, but I'm talking about not just in 10 Mile where this particular part of the farm was. I would say the farm property I'm talking about where the surveillance carrying was captured was a total of 150 acres. Okay. It was a large piece of property. And let me... When I use the word fortress, maybe I should have added Judge Reeves' fortress mentality is the phrase he was using. He mentioned the trucks blocking the driveway. That's one of the things that was indicative of police. You better stay off this property. And we're putting you on notice. You're not coming up our driveway. We're blocking it to make sure you can't. But it's not like it was a fort with a wall around it. As you drove down Dogtown Road or Bernard Naira's Road, you could see the expansive area that I'm talking about. Of course, there is foliage here and there. But in some instances, the camera was capturing with nothing blocking the view. But they would go in and out of... often armed with a pistol on his hip that was visible and come directly down to the trailer of Leon's. And that's where they spent most of their day was down around the trailer. That's where they had their target set up for target practice. That's where you could see them out riding four-wheelers around. You could see them repairing fences. You could see them feeding horses. They expected nobody to be around. That's their argument. Nobody could be here all the time. So I expect, subjectively, that no one's going to see me doing this with my guns. Anybody that drove down those roads could see them with a gun. They can see whether anyone's driving down those roads. That's true, but that doesn't give them an expectation of privacy in the open. That's the issue, I think. Right. So, anyway, back to the number of firearms. Unfettered access to either residence. A total of 25 firearms were discovered from the two residences. No, I take that back. With the exception of three. All of them were recovered either in Rocky Houston's home or Leon Houston's trailer. The Ruger Mini-14 ranch rifle that was most often seen in this defendant's possession was found in Leon Houston's trailer. A prime example of what Judge Reeves pointed to, that this defendant had access to any firearm in that property whenever he needed it. Three of the firearms, of course, were in Leon Houston's personal possession at the time of his being taken into custody when he came across the field between the residence on the four-wheeler that night while the agents were waiting on the search warrants to be issued. But it was a total of 25 firearms, and we suggest that Judge Reeves correctly held him accountable for that number for sentencing purposes. And lastly, with regard to the substantive and procedural reasonableness of the sentence, I again say you had to be there. The counsel for the defendant suggests that an exchange here and there between Judge Reeves and the defendant showed a personal bias against him. That is simply not so. This sentencing began with the defendant being represented by counsel. Shortly into it, as the Houstons were prone to do, both of them, this defendant chose to ask the court to relieve Mr. McGovern of his duties. As always. Like Judge Shirley did over and over again, and like Judge Reeves did over and over again, he tried to talk him out of it. He was not having it. And ultimately, he allowed Mr. McGovern to go to the back of the courtroom, invited him to stay, which he did, but Mr. Houston took over his own representation from that point on. And the amount of patience that Judge Reeves demonstrated over the duration of that sentencing hearing was remarkable. As Mr. You're talking about his bias issue now? Yes. And just quite simply, the judge let Mr. Houston say pretty much anything he wanted to say. Trying to focus him back, trying to coach him back, if you will, to Mr. Houston, tell me mitigating factors about you with regard to your sentence. Stop hurting yourself by essentially feeling good about having killed these men that you want to talk about so much. These were the things that Judge Reeves put up with for probably the better part of an hour before he made the findings he did, which we suggest were perfectly proper. Thank you, counsel. Your time is expired. Very briefly, I think that the court's looking for us to help decide whether there's a bright line rule when the reasonable period ends and the unreasonable period begins, if I understand the question properly. First of all, I'm not sure I'm asking for a bright line rule as opposed to a reason why this goes too far. You can go somewhere down the street, down the road. How far can you go this far? Well, I think I can help you with that because this camera was installed on October the 9th. The first observation of Mr. Houston was October the 11th. October the 11th, there were no weapons in his possession. October the 20th, there are two observations through the camera, without a warrant, of him in possession of weapons apparently. The next observation is November the 5th. The next observation is November the 20th. Now, there are various observations in between those dates, but those are the four dates. Somebody could have come by on each of those days and filmed them, except that they wouldn't have been able to because these people would have seen them on the way and wouldn't have come out. Right, because they had this expectation of privacy, this subjective expectation. Right, but the expectation of privacy is we're in a remote area, so it's going to be hard for them to catch us doing this stuff, so we'll just stay indoor. I mean, it seems like what's going on, according to the rationale of the argument. We'll just stay indoors whenever anyone's coming down the old road. The danger of that is the question I would pose to the court then, does the reasonableness requirement of the Fourth Amendment depend on location? Does it vary if it's a rural area or if it's an urban area? Yeah, that cuts both ways, though. It does. You can't say I'm going to go out in the woods and do things out in the open just because people don't come out in the woods very often. That's not the same thing as being inside your house. I agree, and that's why the first part of my argument, when I said it's a fact-by-fact case determination, and I think they cross the boundary when they look at this for 65 days. I don't think the relevance of the fact, or what I assume is the fact, is that they can see people coming if they're doing a drive-by. So, therefore, drive-bys are not a very practical way of observing what's out in the open. So we want to limit police to something that won't work. I don't think that's what I'm saying at all. That's analogous to the brief flyover. We know that a brief flyover is okay. They do that. That's a lot more expensive than driving down the street in a car. So I don't think that's the point. It's a little harder to get out of the way when the police fly over is when they drive down the street. I don't know that. The other thing is— You're asking us to draw a line based on those kinds of assumptions. I'm asking that you find that this be unreasonable and a violation of the Fourth Amendment. I don't know that you can draw a bright line that would be applicable in every case. And just very quickly, as to the video issue, defense counsel asked for a voir dire of the witness before these lay opinions were offered. That was denied without reasoning in the record. I think it's important that the court would know before he allows that testimony the factual underpinnings so the jury has—is there enough factual underpinning for those opinions, for that opinion to interpret the videos, be there. And thirdly, he seems to be arguing today actual possession in addition to constructive possession. He talks about Rocky having these two firearms in his possession. We think the proper number—Leon hit three on the night of this arrest. Rocky had already been arrested, was not there. We don't know where those three weapons came from, whether there was dominion and control by Rocky. Clearly erroneous is what you're saying. Yes. The weapon count should be less than 25, which would reduce— It's a factual matter. Yes, sir. Thank you. But just one thing, though. Your counsel, the MLA, says that with respect to these guns, both Rocky and Leon had equal access or they had unfettered access to both houses. So if that's true, doesn't that undercut your argument? No, it doesn't. It does not, very briefly, because this is a very large piece of property. The night that Leon—Rocky's already been arrested. The night Leon's coming across these fields on a four-wheeler, they did not see him. They watched somebody in a different area, and then they see this four-wheeler come across. There's no showing of dominion or control over these weapons, even where they came from, on the night they were possessed by Leon. They didn't come out of the house where they say he had unfettered access. Thank you. Thank you. The case will be submitted. Mr. Kager, I see you were appointed under the Criminal Justice Act, and we appreciate your service. Thank you.